UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

ROBERT WAYNE HILBERT II,                    )
               Plaintiff,                        )          Civil No. 5:14-cv-00038
v.                                                       )
                                 )          **MEMORANDUM OPINION**
CAROLYN W. COLVIN,                         )
Acting Commissioner,                          )          By:    Joel C. Hoppe
Social Security Administration,              )          United States Magistrate Judge
               Defendant.                     )

        Plaintiff Robert Wayne Hilbert II asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. The case is before me by the parties' consent

under 28 U.S.C. § 636(c)(1). ECF Nos. 9–10. Having considered the administrative record, the

parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final

decision is not supported by substantial evidence in the record. The decision will be reversed and

the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

        The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The claimant

Case 5:14-cv-00038-JCH   Document 21   Filed 07/27/15   Page 2 of 26   Pageid#: 1098

bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Hilbert filed for DIB and SSI on February 10, 2011. *See* Administrative Record ("R.") 176. He was 38 years old, *id.*, and had worked as an artificial inseminator at a poultry plant, a line worker, and a groundsman. R. 243–44. Hilbert alleged disability beginning November 19, 2010, because of a 50% disability in his left foot after three or more surgeries;[1] surgical hardware in his right foot; injuries to the left knee, forearm, and hip; and degenerative disc disease. *See* R. 397. After the state agency twice denied his applications, R. 259–60, Hilbert appeared with counsel at a hearing before an ALJ on December 6, 2012, R. 193. He testified about his chronic musculoskeletal pain and the limitations it caused in his daily activities. *See* R. 194–202. A vocational expert ("VE") also testified as to Hilbert's ability to return to his past work or to perform other work existing in the economy. *See* R. 202–12.

The ALJ denied Hilbert's applications in a written decision dated December 21, 2012. *See* R. 176–85. He found that Hilbert suffered from severe impairments of osteoarthritis, left foot disorder status-post open reduction internal fixation and calcaneal joint fusion, status-post open reduction internal fixation of the right lateral malleolus, lateral epicondylitis of the left elbow,

---

[1] Many years ago, Hilbert filed for DIB and SSI alleging disability beginning April 10, 2001, R. 351, the date on which a forklift crushed his left foot, R. 597, 600, 643. He apparently did not work for several years, R. 350, while recuperating from that injury and three subsequent corrective surgeries. *See generally* R. 528, 532–33, 559–60, 565–68, 571–72, 574, 578, 580–81, 585, 588, 590–92, 597–600, 608, 617, 623, 632–33, 638–40, 642–43. The state agency rejected Hilbert's SSI application on December 29, 2004, and his DIB application on January 5, 2005. R. 351–52; *see also* R. 845. He did not appeal those decisions to an ALJ, R. 393–94, 962, before returning to the workforce in early 2006, R. 350, 362. Hilbert quit working because of his current conditions on November 19, 2010. R. 397; *see also* R. 197.

3

and degenerative disc disease,[2] but that these impairments did not meet or equal a listing. R. 178–79. The ALJ next determined that Hilbert had the residual functional capacity ("RFC") to perform a range of sedentary work. R. 179. Specifically, he found that Hilbert could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for four hours and sit for six hours in an eight-hour workday; frequently kneel, stoop, or crouch; occasionally push, pull, reach overhead, balance, and crawl and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. *Id.* He also must avoid concentrated exposure to vibration and workplace hazards. *Id.*

The ALJ noted that this RFC ruled out Hilbert's return to all of his past relevant work. R. 183. Finally, relying on the VE's testimony, the ALJ concluded that Hilbert was not disabled after November 19, 2010, because he could still perform certain jobs available nationally and in Virginia, such as assembler, telephone representative, or appointment clerk. R. 184. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Relevant Evidence

Hilbert's medical records document a history of injuries to—and subsequent degenerative changes in—his left foot, hip, and elbow, right hand, and both ankles. In April 2001, a forklift crushed Hilbert's left foot. R. 528. Hilbert underwent three separate reconstructive surgeries between May 2001 and January 2004. R. 528, 532–33, 635–37, 638–40. On November 4, 2004, Herbert Joseph, M.D., determined that Hilbert's left foot had reached "maximum medical improvement" in that "[n]o further treatment [was] indicated." R. 533. Even so, Dr. Joseph

---

[2] The ALJ also found that Hilbert had "a history of depression and alcohol abuse," but that he "did not allege problems stemming from a mental condition" and the record did not contain evidence of "counseling sessions or treatment by a mental health professional, . . . as would be expected if his symptoms were significant." R. 178. Thus, the ALJ concluded that these medically determinable impairments were "non-severe" because they "did not cause more than minimal limitations in [Hilbert's] ability to perform basic mental work activities." R. 178–79.

4

opined that Hilbert had a permanent "total impairment of 50% of the left lower extremity" secondary to atrophy, sensory loss, ankle weakness, loss of motion, "deformity of the hindfoot," chronic pain, and the need for continued analgesics. R. 532–33. On exam, Dr. Joseph documented "no subtalar motion" in Hilbert's left ankle, "weakness of the big toe extension on the left . . . normal ankle dorsiflexion, but [a lack of] 20 degrees of plantar flexion compared to the opposite side." R. 532.

On March 1, 2005, Shepard Hurwitz, M.D., diagnosed a "painful injury with deformity of the left foot" and "post-traumatic arthritis" in Hilbert's left foot, resulting in "about 25% loss" of function in the left lower extremity. R. 597–98. Dr. Hurwitz opined that Hilbert should "restrict" his time standing and walking; only work indoors during inclement weather; and never climb ladders, kneel, squat, or perform overhead work. *Id.*

In October 2005, Hilbert underwent surgery to repair a broken right ankle. Gregory Hardigree, M.D., placed a metal "plate and screw fixation device" to fuse a "minimally displaced spiral fracture of the distal fibula." R. 850, 852–53. At the time, Dr. Hardigree noted that Hilbert was on "chronic Hydrocodone at one tablet a day" because of his left ankle injury. R. 846.

Hilbert was in a car accident in May 2007. *See* R. 840. Harold Jenkins, M.D., noted that a CT scan showed degenerative disc disease at C3-4 and "some degenerative changes" around Hilbert's left hip. R. 840–41. There was "no evidence of fracture or dislocation." R. 841.

On January 13, 2010, Hilbert received an injury to his right hand and arm from a turkey at work. R. 891. He appeared in the ER with swelling on January 17, and was released the next day after receiving antibiotics. R. 711, 715. Osteoarthritis of the thumb joint was noted on an X-ray. R. 896. Upon release, Reena Rizvi, M.D., determined that Hilbert could "return to work on 01/21/2010 without restriction." *Id.*

Hilbert also reported occupational-related pain in his arm in March 2010. R. 887. He attended physical therapy for tennis elbow seven times between August 30 and October 20, 2010. *See* R. 676–77. He received a cortisone shot in his left elbow on September 10, 2010. R. 876. On October 20, 2010, Kenneth Haskell discharged Hilbert from physical therapy. R. 865 Haskell noted that Hilbert made "excellent progress" and described his prognosis as "good . . . in conjunction with a home exercise program." *Id*. In particular, Haskell observed that Hilbert now had "good" strength and "no pain" or swelling in his wrist—a considerable improvement from the "pain and marked weakness" that Hilbert suffered when he started therapy. *Id.*

On December 29, 2010, Hilbert was seen in the emergency department for a persistent cough. A neurological exam revealed that Hilbert moved all four extremities and walked without difficulty. R. 861.

Hilbert filled out a Pain Questionnaire and Adult Functioning Report in spring 2011. R. 404–06, 432–42. He reported experiencing constant "aching, stabbing, burning, throbbing, cramping, crushing" pain in his shoulders, feet, left hip, and left knee. R. 405. He said that it hurt too much for him to bend, squat, or stoop and that sitting or standing for even 30 minutes "causes pain." R. 406. He said that he could walk 50 yards before needing to stop and rest for 30 minutes. R. 438. Hilbert explained, "all of my physical problems are due to having my foot run over by a forklift, being in a car wreck, and being severely beaten." *Id.*

Hilbert denied having any trouble using his hands for tasks such as shaving and feeding himself, R. 433–42, though he did report difficulty with buttons, R. 434. He said that any extended effort to perform household chores was "very painful." R. 435. Other than sitting on his porch daily, he rarely left the house. R. 436. During the rare times he went shopping, he had to move more slowly than he had previously. *Id*. Hilbert said he now used a cane. R. 437, 439.

6

On May 16, 2011, state-agency medical consultant R.S. Kadian, M.D., reviewed Hilbert's records available through March 30, 2011. R. 217. He noted that Hilbert had undergone "surgery for his impairment," but opined that the "record reflect[ed] that the surgery was generally successful in relieving the symptoms." R. 220. Dr. Kadian also noted that Hilbert could "stand, walk, and move about within normal limits," and "use [his] hands for . . . grasping or handling objects." R. 223. Specifically, Dr. Kadian opined that Hilbert could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; sit and stand or walk for about six hours each in an eight-hour workday; and "occasionally" push or pull with his left arm. R. 220–21. Dr. Kadian did not identify any manipulative or postural limitations. R. 221.

On July 1, 2011, Hilbert visited Dayton Family Medicine complaining of pain in both ankles, the left hip, and the left knee. R. 967. Hilbert described his ankle pain and left hip pain, along with some knee pain, as "his most disabling problems." *Id.* Hilbert reported no upper extremity pain or limitations. *Id.* He also mentioned that he could not stand very long and could not lift, bend, or twist easily on account of his lower extremity pain. *Id.* On exam, Ronald Schubert, M.D., and Tifane Chapman, L.N.P., observed "decreased movement"—and "no lateral movement"—in Hilbert's left ankle. R. 967–68. Hilbert reported no pain on stressing his left hip and denied generalized weakness. R. 968. Dr. Schubert and radiologist R. Pence, M.D., observed that X-rays taken the same day revealed Hilbert's "left hip [was] quite arthritic from old injuries," while his left foot showed "significant midfoot osteoarthritis" with fixation screws and his left ankle joint showed "some posttraumatic osteoarthritis." R. 969, 971. Hilbert's left knee appeared normal. R. 969. Dr. Schubert and/or Nurse Chapman opined that "Hilbert clearly would not be able to do a walking job [or] job requiring walking[,] bending[,] or twisting[;] he has severe osteoarthritis and posttraumatic arthritis of his left ankle and his hip on the left." R. 968.

They also added citalopram and tramadol to Hilbert's hydrocodone-acetaminophen regimen. R. 967, 969.

In a Pain Questionnaire dated September 15, 2011, Hilbert again reported experiencing "constant" "aching, stabbing, burning, throbbing, cramping, and crushing" pain in both ankles, hands, and shoulders. R. 458. He noted that he was on citalopram, hydrocodone, and ibuprofen, which made the pain "easier to cope with." R. 459 ("The medications take the edge off of it . . . but the deep pain never goes away."). He indicated that the medication's side effects gave him "strange dreams." *Id.*

On December 1, 2011, state-agency medical consultant Dr. John Sadler reviewed Hilbert's records. R. 236. The only additional exhibits submitted to Dr. Sadler following Dr. Kadian's review were Hilbert's subjective reports that his condition had deteriorated in the past six months. Nonetheless, Dr. Sadler imposed stricter limitations on Hilbert's functional abilities than did Dr. Kadian. *Compare* R. 241–45, *with* R. 221–23. For example, Dr. Sadler opined that Hilbert could stand or walk for only four hours in an eight-hour workday; frequently kneel, stoop, or crouch; occasionally push or pull with his left upper and lower extremities; occasionally reach overhead with his left upper extremity; occasionally balance and crawl and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. R. 241–43. He also opined that Hilbert must avoid concentrated exposure to vibration or workplace hazards. R. 243.

Dr. Sadler explained that these limitations were based on "left tennis elbow and foot surgery with complaints of numbness." R. 241. Dr. Sadler opined that Hilbert was "able to sit within normal limits" and that while Hilbert might not be able to walk for a full day, he was "still able to safely maneuver through most of the day." R. 245. Dr. Sadler also observed that Hilbert's reported daily activities "seem[ed] excessively limited at times in light of [Hilbert's] allegations

8

and the [medical evidence of record] present in [the] file showing normal gait, strength, and [range of motion]." R. 240.

On February 2, 2012, Hilbert indicated that his condition had deteriorated in the past month because a "screw is loose and I can feel stuff moving in my ankle, it's very painful." R. 492. He said that the doctors had changed his pain medication from methadone to Cymbalta and that the latter did not work as well. R. 498. Hilbert's mother filled out a Third Party Function Report a few days later, saying that Hilbert's "feet swell, he has to sit, but after a while he can't hardly get up. He limps when he walks." R. 506. A few days later, Hilbert's friend reported similar observations, noting "his ankle and hip have gotten worse" and that "his hip hurts him so much that he makes bad jokes about me cutting it off with the chainsaw." R. 522.

On July 16, 2012, Hilbert visited UVA Hospital for an evaluation of his left foot, complaining of decreased sensation and pain around the protrusion in the foot. R. 977. Joseph Park, M.D., opined that X-rays taken that day showed a well-healed triple arthrodesis with two screws in the left foot and no subtalar hardware seen. R. 978. They also showed "advanced degenerative osteoarthritis in the midfoot" and "moderate cystic degenerative change of the medial ankle joint." R. 980. Dr. Park wrote to Dr. Schubert that they should "[c]onsider removal of the medical hardware," R. 981, due to possible irritation from the medial screw rather than nerve pain. R. 978. Dr. Park told Hilbert to follow up in two months. R. 979. He also suggested "smoking cessation." R. 978.

Hilbert returned to UVA Hospital on October 3, 2012, complaining of pain in his left hip, which was aggravated by walking and occasionally caused him to fall. R. 987. Hilbert told Quanjun Cui, M.D., that the pain resulted from an accident many years earlier. *Id.* Hilbert complained of daily deep aches, averaging between 7/10 and 10/10. *Id.* He described his left hip

9

pain as worse with weight bearing and explained that walking, climbing stairs, kneeling, squatting, and inactivity all aggravated the hip. *Id.* Hilbert said that he could no longer perform household chores that required standing for more than five to ten minutes at a time. *Id.* He reported that non-steroidal anti-inflammatory drugs offered little relief. *Id.*

X-rays taken that day showed arthritic changes in both hips, worse on the left, as well as left-sided femoral head osteonecrosis. R. 988–89. Dr. Cui performed a physical exam, finding full painless range of motion in the right hip and full range of motion in the left hip, albeit with reported pain. R. 988. Dr. Cui recommended non-surgical "conservative management," including weight loss, low-impact exercise, and use of a cane or walker and, if those measures were not successful, injections. R. 989. Hilbert underwent a fluoroscopic injection of the left hip joint on the same day. R. 996.

On October 23, 2012, Hilbert visited UVA Hospital complaining of ankle pain that kept him from working. R. 983. He explained that he was not on a specific pain regimen, but that he had been using his girlfriend's narcotics and drinking 12 beers a day to relieve the pain. *Id.* On exam, P. Preston Reynolds, M.D., Ph.D., noted that Hilbert's left ankle hardware was palpable on the joint. R. 984. Hilbert's muscle tone and coordination were normal. *Id.* Dr. Reynolds recommended that Hilbert continue taking Cymbalta and that he begin using a lidocaine patch and gabapentin. *Id.* Dr. Reynolds suggested a follow-up visit after four weeks to assess Hilbert's response to the new pain medications. R. 985.

At the administrative hearing on December 6, 2012, Hilbert testified that he could not work because of pain running from his left hip into his left foot. R. 194. He explained, "my left hip has got bone on bone in there and the cartilage is completely gone," to the point that his doctors were "planning to do hip surgery . . . soon" because "different medicines and everything"

10

had not worked. *Id.* Hilbert reiterated his complaints of left ankle pain, reporting that a screw was "backing out where the previous screw was put in there." R. 195. Hilbert said that he was taking Neurontin (gabapentin), Celebrex, and Cymbalta, which worked "just enough to sort of cope with" the pain. *Id.*

He said that he had fallen several times on account of instability of the legs, R. 196, that that he could sit for only an hour or two, and that after sitting he needed to stand for at least ten minutes before he could get back to work. R. 198. Hilbert also said that his hands were going numb on account of injuries related to his job as a turkey inseminator, but that he could still manage woodworking with some difficulty. R. 196–99. He said that the pain sometimes interfered with his ability to watch TV. R. 201. On a bad day, he had to stay on the couch and remain inactive all day. *Id.* He said that these days occur "pretty much about every day of the week" with the exception of about two days per week. R. 202.

## IV. Discussion

Hilbert's overarching objection is that substantial evidence does not support the ALJ's RFC determination. *See generally* Pl. Br. 5–12. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his RFC finding, *Mascio*, 780 F.3d at 636, and why he discounted

11

any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

Hilbert argues that the ALJ erred in evaluating his credibility and in adopting Dr. Sadler's December 2011 RFC assessment. *See generally* Pl. Br. 5–12. In particular, he objects that the ALJ's RFC determination does not reflect Hilbert's alleged manipulative limitations, reliance on pain medication generally, or the combined limiting effects of his chronic "hip/ankle/foot pain." *See id.* at 6–7, 8–12.

A.      *Hilbert's Credibility*

The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[3] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 595.

---

[3] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p, at *2, *4. The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Rather, he must consider all the relevant evidence in the record, including the claimant's other statements, his treatment history, any medical-source statements, and the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *See Mascio*, 780 F.3d at 639; *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96-7p, at *4). A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio*, 780 F.3d at 640.

1.    *ALJ's Findings*

The ALJ found that Hilbert's musculoskeletal "impairments could reasonably be expected to cause the alleged symptoms," but that Hilbert's statements, along with the similar statements of his mother and friend, "concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [ALJ's] residual functional capacity assessment." R. 180. The ALJ gave four reasons for rejecting Hilbert's allegations that his "poor grip strength" and "chronic, severe" left foot, leg, and hip

13

pain rendered him unable to perform even "a range of sedentary work"[4] with certain postural and environmental restrictions. *See* R. 180–82, 183 ("In sum, the above [RFC] assessment is supported by the medical evidence of record and the opinions of the State agency disability experts.").

First, the ALJ found that, while Hilbert "underwent multiple corrective surgeries" on his left foot and both ankles, he "generally recovered from these conditions/procedures, as he was able to return to work . . . during 2006, 2007, 2009 and 2010." R. 182. The ALJ also found that Hilbert's "treatment notes d[id] not detail a significant worsening of his conditions since this time." *Id.* Second, the ALJ found that "repeated physical examinations ha[d] failed to reveal significantly decreased strength of any extremity, as would be expected" given the "significant functional limitations" Hilbert alleged. *Id.* He also noted that Hilbert "moved all [four] extremities and was ambulatory" during an ER visit in December 2010. *Id.*

Third, ALJ found that Hilbert's treatment since November 2010 had been "relatively limited and conservative overall" and that there were "significant gaps" in that treatment. *Id.* "Other than a left hip steroid injection" in October 2012, for example, Hilbert's pain was "treated primarily, although not consistently throughout the period at issue, with medications, which appear[ed] to have been relatively effective in controlling his symptoms." *Id.* The ALJ also

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time" and occasionally lifting or carrying objects like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one [that] involves sitting, a certain amount of walking and standing [are] often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* "Occasionally" means "no more than about" two hours in an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

The ALJ's RFC assessment, R. 179, is generally more consistent with a reduced range of "light" work. 20 C.F.R. §§ 403.1567(b), 416.967(b); *see Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999) (noting that a person who can occasionally lift 20 pounds and frequently lift 10 pounds can perform light work if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting").

found that Hilbert did not "require frequent physician visits, surgical intervention, or hospitalizations" after November 2010, which "belie[d] allegations of disabling symptoms or functional limitations." *Id.* Finally, the ALJ found that Hilbert did not quit smoking "despite having been advised by a treating physician [(Dr. Park)] to do so." *Id.*

    *2.    Analysis*

    Hilbert correctly points out that the ALJ's credibility finding appears in a legally flawed boilerplate statement:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however the statements of the claimant, his friend, and his mother concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 180. This "vague and circular" language "'gets things backwards' by implying 'that [the] ability to work is determined first and is then used to determine the claimant's credibility.'" *Mascio*, 780 F.3d at 639 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). A "claimant's pain and [RFC] are not separate assessments to be compared with each other." *Id.* Instead, the RFC must reflect the "extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain," limit his functional ability to perform work-related activities. *Id.* (emphasis omitted).

    The ALJ "should have compared [Hilbert's] alleged functional limitations from pain to the other evidence in the record, not to [his] residual functional capacity." *Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). His reliance on this boilerplate statement is harmless, however, if he properly analyzed Hilbert's credibility elsewhere in his written decision. *Mascio*, 780 F.3d at 639. Although the ALJ "provided a comprehensive list of reasons," *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *5 (W.D. Va. Sept. 12, 2014), for largely discrediting

15

Hilbert's complaints of debilitating pain and physical limitations, most of those reasons do not withstand scrutiny.

Indeed, much of the ALJ's rationale conflicts with medical evidence that the ALJ discussed elsewhere in his decision, contradicts his own factual findings, and relies on evidence having little, if anything, to do with Hilbert's alleged pain or functional limitations. *See Mascio*, 780 F.3d at 639–40 (finding that the ALJ did not properly analyze the claimant's "statements that her pain is as limiting as she ha[d] alleged" in part because one of the ALJ's three reasons for discrediting those statements had "nothing to do with pain"); *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (noting that the ALJ cannot "select and discuss only th[e] evidence that favors his ultimate conclusion"); *Eggleston*, 2013 WL 5348274, at *4 (noting that the ALJ's "credibility finding must be grounded in the evidence" and "cannot be based on an intangible or intuitive notion about an individual's credibility").

The ALJ first found that, despite undergoing "multiple corrective surgeries" on his left foot and both ankles, Hilbert "generally recovered from these conditions/procedures, [and] was subsequently able to" perform various physically demanding jobs from 2006 to 2010. R. 182; *see also* R. 183 (noting that Hilbert had "past relevant work as a poultry plant inseminator [sic], meat packager, sheet/metal helper [sic], and grounds keeper," which the VE classified as "medium" to "heavy" work). Hilbert "cannot claim disability based on medical conditions []he experienced while working," *McDilda v. Barnhart*, No. 6:04cv36, 2005 WL 831253, at *5 (W.D. Va. Apr. 8, 2005), unless he shows that those conditions "actually deteriorated significantly from the time when []he was admittedly able to work." *Craig*, 76 F.3d at 596 n.7. The ALJ found that Hilbert's "treatment notes d[id] not detail a significant worsening of his condition since" November 2010 when Hilbert quit working at the poultry plant because of his current conditions. R. 182.

16

The pre-onset treatment notes mostly document objective findings, such as "post-traumatic arthritis" in the left foot, "no subtalar motion" in the left ankle, and "some degenerative changes" around the left hip. *See* R. 532–33 (2004); R. 597–98 (2005); R. 840–41 (2007). They do not contain statements from any source describing the nature and severity of Hilbert's musculoskeletal impairments between 2006 and 2010. *See* R. 840–41.

As to the post-onset notes, in July 2011, Dr. Schubert opined that recent X-rays now showed "severe" and "significant" osteoarthritis in Hilbert's ankle, foot, and left hip. R. 969. One year later, Dr. Park noted that recent X-rays of Hilbert's left foot and ankle showed "advanced" degenerative osteoarthritis in the midfoot and "moderate" cystic degenerative changes in the medial ankle joint. R. 980. Dr. Park also told Dr. Schubert that a medial screw might be the source of "decreased sensation and pain around the protrusion" in Hilbert's left ankle and that they should consider removing the hardware after ruling out nerve pain secondary to Hilbert's original injury.[5] R. 981. In October 2012, an examining physician noted for the first time that recent X-rays showed femoral head osteonecrosis in Hilbert's left hip. R. 988–89. The same treatment notes document Hilbert's statements describing his increasingly debilitating chronic ankle and hip pain. R. 967, 977, 987.

The ALJ considered this evidence when summarizing Hilbert's post-onset treatment notes, R. 181, but he did not mention it when finding—without any explanation—that the same exhibits did "not detail a significant worsening" of Hilbert's foot, ankle, and hip impairments since he quit working in November 2010, R. 182.[6] That finding also seems to contradict the

---

[5] In July 2011, February 2012, and December 2012, Hilbert told the agency that his condition had deteriorated because of a "very painful" defective screw in his left ankle. R. 452, 492, 195.

[6] Indeed, the only exhibit that the ALJ cited to support this finding is Exhibit 5D, which is Hilbert's career earnings record. R. 182 (citing R. 349–64). That evidence has nothing to do with the contents of Hilbert's pre-onset or post-onset treatment notes. *See Richardson v. Perales*, 402

17

ALJ's finding at step four that Hilbert's "sedentary" RFC precludes him from performing any of the "medium" to "heavy" work he did between 2006 and 2010. R. 183. If Hilbert's condition did not "actually deteriorate[] significantly from the time when []he was admittedly able to work" those particular jobs, *Craig*, 76 F.3d at 596 n.7, despite chronic osteoarthritis pain in his left lower extremity, then the ALJ's RFC determination makes very little sense. On this record, the ALJ's lack of explanation for the former finding undermines his credibility determination.

The ALJ also found that "repeated physical examinations ha[d] failed to reveal significantly decreased strength of any extremity, as would be expected" given the "significant functional limitations" Hilbert alleged. R. 182. This rationale is correct to the extent that Hilbert claims his "poor grip strength," R. 180, causes significant manipulative limitations.[7] *Compare* R. 199–200, *with* R. 864–65, 984.

But Hilbert repeatedly said that his most significant problem is pain in his ankles and hip—not muscle weakness or decreased strength. *See, e.g.*, R. 194–95, 967, 987, 406, 438, 452. The ALJ did not explain how "the record, when read as a whole, reveals [any] inconsistency between," *Hines*, 453 F.3d at 565, Hilbert's normal lower-extremity strength, R. 967, 984, and his allegation that "chronic severe . . . left leg, foot, and hip pain" limits his ability to sit for "20

U.S. 389, 401 (1971) ("[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

[7] Additionally, the VE testified that "problems . . . gripping things" would eliminate just one of the three occupations she determined Hilbert could perform with the RFC set out in the ALJ's decision. *See* R. 204, 207–08. Hilbert still could work as an apportionment clerk or telephone representative, which together account for 13,500 jobs in Virginia. R. 205, 208. The ALJ's failure to include Hilbert's alleged manipulative limitations in his RFC, if error, was therefore harmless. *Cf. Chestnut v. Colvin*, 4:13cv8, 2014 WL 2967914, at *2 n.4, *10, *10 n.16 (W.D. Va. June 30, 2014) (ALJ's finding that claimant could perform either of two occupations was harmless error where substantial evidence supported the ALJ's finding that the claimant could perform one occupation with 920 jobs in her home state); *Carr v. Comm'r of Soc. Sec.*, No. 4:10cv25, 2011 WL 1791647, at *10 (W.D. Va. May 11, 2011) (substantial evidence supported the ALJ's conclusion that the claimant was not disabled because she could perform two occupations with a combined 2,000 jobs available in her home state).

minutes before needing to stand up for 10–15 minutes," R. 180; to stand for 10–30 minutes at one time, R. 987, 406; and to "walk for 50 yards (with significant pain) before needing to stop and rest for 15–30 minutes," R. 180. Nor does the ALJ explain why Hilbert's ability to "ambulate[] without difficulty" on one neurological exam in December 2010, R. 861, conflicts with Hilbert's allegations that his pain is "so continuous and/or severe," *Hines*, 453 F.3d at 565, that he cannot stand/walk for four hours in a normal eight-hour workday, five days a week. R. 179; *see Hines*, 453 F.3d at 565.

Elsewhere in his decision, the ALJ also cited "the absence of evidence of major dysfunction of a joint, reconstructive surgery, or surgical arthrodesis of a major weight bearing joint" in finding that Hilbert's severe musculoskeletal impairments did not meet or equal a listing. R. 179. Although Hilbert did not have *additional* reconstructive/arthrodesis surgeries between November 2010 and December 2012, he claims—and the ALJ found—significant functional limitations related to three such surgeries and "major dysfunctions" of two major weight-being joints. R. 178–79, 182–83 (ALJ's findings related to Hilbert's foot, ankle, and hip); R. 194–95, 438, 452, 492, 967, 977, 983, 987 (Hilbert's post-onset statements); *see* R. 221–23, 241–43, 968–69, 980–81, 984, 988–89 (relevant post-onset medical evidence).

In determining Hilbert's RFC, the ALJ apparently "chose to credit some, but not all, of [his] statements," *Mascio*, 780 F.3d at 639–40. *See* R. 180, 183. For example, Hilbert testified that he walks with a stick (or cane) "to keep from falling into stuff or falling down," and that he can sit and work on a project for a few hours only if he stands up and walks around for 10 or 15 minutes "a couple of times an hour." R. 195, 198. It appears the ALJ credited the first statement by restricting Hilbert's exposure to workplace hazards, such as unprotected heights and machinery. R. 179, 183. But the ALJ's RFC determination does not allow Hilbert to stand up and

walk away from his work station every 15 to 20 minutes. *See id.* The VE testified that this additional restriction alone would support a finding of disability. R. 206–07.

The ALJ's fourth reason for discrediting Hilbert's complaints—that he kept smoking against Dr. Park's advice—"has nothing to do with pain." *Mascio*, 780 F.3d at 639. The ALJ did not explain why this fact undermined Hilbert's statements describing the intensity, persistence, and limiting effects of his musculoskeletal pain. *See id.*

Finally, the ALJ found that Hilbert's treatment since November 2010 was "relatively limited and conservative overall" and that there were "significant gaps" in his treatment history. R. 182. "[A]n unexplained inconsistency between the claimant's characterization of the severity of [his] condition and the treatment []he sought to alleviate that condition" can weigh against the claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994); *accord Dunn v. Colvin*, --- F. App'x ---, 2015 WL 3451568, at *8–10 (4th Cir. June 1, 2015) ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . ."). Hilbert does not challenge the ALJ's finding that his treatment during the relevant period was "limited and conservative" or that it consisted "primarily" of pain medication. *See generally* Pl. Br. 6–9; *see also* R. 865, 967, 969, 984, 989, 996. Instead, he argues that the ALJ's summary of Hilbert's treatment notes "frequently" fails to mention his "medications and never contain[s] any commentary concerning their type, dosage, effectiveness, and side effects." Pl. Br. 7.

The ALJ noted that physicians prescribed tramadol, gabapentin, and lidocaine patches, R. 181, and found that Hilbert's "medications . . . appear[ed] to have been relatively effective in controlling" his chronic pain, R. 182. Although the ALJ did not discuss all of Hilbert's prescriptions, *see* R. 967, 985, it is sufficiently clear that he "considered" the "type, dosages,

20

effectiveness, and side effects" of the medications Hilbert took to relieve his pain. *See* R. 180–82 (citing R. 967, 985); *see also Reid*, 769 F.3d at 865. Hilbert does not point to any medication-related "evidence not considered by the [ALJ] that might have changed the outcome of his disability claim," *Reid*, 769 F.3d at 865. *See, e.g.*, Pl. Br. 7 (stating without explanation that Hilbert's pain medications "have tremendous impact on functional capacity in the competitive workplace"). Hilbert also does not explain the many gaps in his treatment history, which ranged from a few months to a full year. R. 861, 967 (Dec. 2010–July 2011); R. 967, 977 (July 2011–July 2012); R. 977, 987 (July–Oct. 2012). It was not unreasonable for the ALJ to find that gaps in Hilbert's already "limited and conservative" treatment weighed against his complaints that he suffered "chronic, severe" pain and disabling physical limitations. *See Mabe v. Colvin*, No. 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) ("numerous and significant gaps" in claimant's treatment history supported ALJ's adverse credibility finding).

A claimant's sporadic, conservative treatment may be reason enough to "prevent [him] from being totally disabled." *Cf. Dunn*, 2015 WL 3451568, at *10, 11–12 (noting that the "conservative nature of Appellant's treatment," as well as her unjustified noncompliance with that treatment, "was sufficient to prevent her from being totally disabled"). In Hilbert's case, however, there are too many flaws in the ALJ's analysis—and sufficient evidence to the contrary—for the Court to hold that his decision to reject Hilbert's alleged limitations except to the extent reflected in his RFC determination was harmless error. *Compare Mascio*, 780 F.3d at 639–40, *with Bishop*, 583 F. App'x at 68.

B.    *Dr. Sadler's Medical Opinion*

Hilbert also objects to the ALJ's reliance on Dr. Sadler's opinion of Hilbert's functional limitations. *See* Pl. Br. 7. He argues that the opinion is incomplete because Dr. Sadler never

personally examined him, did not consider his friend's and mother's third-party function reports, and did not have any medical evidence produced after December 2010. *See id.*

"Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical reviewers. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Opinions from non-treating sources are not entitled to any particular weight. *See id.* Rather, the ALJ must consider certain factors in determining what weight to give such opinions, including the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *See id.* The ALJ must explain the weight given to all medical opinions. *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-8p, at *5).

1.    *ALJ's Findings*

The ALJ gave "considerable weight" to Dr. Sadler's opinions because he found them to be "consistent with and supported by the other evidence of record, including treatment notes." R. 183. His RFC finding expressly incorporates Dr. Sadler's opinion that Hilbert can perform a limited range of light work with certain postural and environmental restrictions. R. 179, 183.

The ALJ gave "little weight" to the July 1, 2011, "Dayton Family Medicine" opinion "that [Hilbert] 'clearly' would not be able to do a job requiring walking, bending, or twisting secondary to his osteoarthritis." R. 182 (citing R. 968). The ALJ found that this "conclusory" opinion offered "very little explanation of the evidence relied upon in forming it," did not include any "specific" functional limitations, and was "not consistent with the medical evidence of record," which reflected "minimal treatment" that "belie[d] allegations of disabling symptoms and functional limitations." *Id.*

  2.  *Analysis*

Substantial evidence does not support the ALJ's reasons for giving "little weight" to Dr. Schubert's opinions[8] that "Hilbert clearly would not be able to do a walking job [or] job requiring walking[,] bending[,] or twisting[;] he has severe osteoarthritis and posttraumatic arthritis of his left ankle and his hip on the left." R. 968. Read in context, the opinion rules out any "job requiring walking, bending, or twisting" because Hilbert has "severe" and "significant" osteoarthritis and post-traumatic arthritis in his left ankle and hip, as shown on X-rays taken during the July 1 office visit. The ALJ recognized as much in summarizing the portion of the opinion that he rejected: "A July 1, 2011[,] treatment note from Dayton Family Medicine states

---

[8] It is not entirely clear whether Dr. Schubert gave this opinion directly or whether he later endorsed Nurse Chapman's opinion. Either way, courts have recognized that nurse practitioners typically work under a physician's supervision and that the supervising physician adopts the nurse's diagnoses, prognoses, and opinions if he or she signs the records. *See, e.g.*, *Alexander v. Colvin*, No. 9:14-2194, 2015 WL 2399846, at *6 (D.S.C. May 19, 2015); *Johnston v. Colvin*, No. 7:12cv617, 2014 WL 534080, at *8 (W.D. Va. Feb. 12, 2014) (explaining that the realities of today's healthcare system often demand an arrangement where nurse practitioners attend to patients instead of physicians).

23

that the claimant 'clearly' *would not be able to* do a job requiring walking, bending, or twisting *secondary to* his osteoarthritis."[9] R. 182 (emphasis added).

The ALJ also mentioned the providers' findings "on examination" that Hilbert had "no lateral movement" in his left ankle and that X-rays showed "significant midfoot osteoarthritis" in the left foot and "some posttraumatic osteoarthritis" in the left ankle, R. 968–71, when summarizing the treatment note earlier in his decision. R. 181. Yet he did not mention this medical evidence when rejecting Dr. Schubert's opinion as "conclusory" and "not consistent with the medical evidence of record." R. 183. Dr. Schubert's objective findings are directly related to a limitation in walking. Even so, those errors alone may not have warranted reversal and remand in Hilbert's case. *See, e.g.*, *Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's decision to reject treating physician's opinion that "appeared to mirror Bishop's subjective statements of his limitations," but was inconsistent with "the conservative nature of Bishop's treatment[] and the generally normal findings during physical examinations").

The larger problem, however, is that the ALJ did not explain his reliance on Dr. Sadler's December 2011 RFC assessment. An ALJ can rely on a non-examining physician's opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984); *see also Radford*, 734 F.3d at 295 (citing *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (holding that a non-examining physician's opinion cannot by itself constitute substantial evidence)). The ALJ in this case did not identify the specific "evidence of record, including treatment notes," that he thought was consistent with Dr. Sadler's RFC assessment. *See Mascio*,

---

[9] The ALJ's RFC restricting Hilbert to "a range of sedentary work," R. 179, is arguably consistent with Dr. Schubert's opinion that Hilbert "would not be able to do a walking job," R. 969. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 767 n.5 (W.D. Va. 2002) ("'The primary difference between sedentary jobs and most light jobs' is that a job is in the 'light' category 'when it requires a good deal of walking or standing.'" (quoting SSR 83-10, 1983 WL 31251, at *5)); 20 C.F.R. §§ 404.1567(a)–(b), 416.967(a)–(b).

24

780 F.3d at 637 (noting that the ALJ's RFC assessment must include a narrative discussion describing how specific medical facts and non-medical evidence support "each conclusion" in his RFC determination).

The ALJ's finding also implies that Dr. Sadler's opinions were "consistent with and supported by" probative medical evidence—including three sets of X-rays and four examining physicians' treatment notes—that Dr. Sadler did not have in December 2011. *See* R. 183. Hilbert correctly points out—and the Commissioner does not acknowledge—that the more recent records contain Dr. Schubert's and Dr. Park's opinions that Hilbert had "severe," "significant," and "advanced" post-traumatic osteoarthritis in his left foot, ankle, and hip, R. 969, 980–81, and might need surgery to remove defective hardware in his ankle, R. 981. Some of those treatment notes also contradict Dr. Sadler's finding that the medical evidence documented "normal" range of motion in Hilbert's lower extremities, R. 240. *See* R. 968 (noting "decreased movement" and "no lateral movement" in the left ankle). The ALJ's reliance on Dr. Sadler's opinion may prove sound, but he must adequately explain why that opinion is consistent with the record as a whole.

## V. Conclusion

The ALJ improperly assessed Hilbert's credibility, in particular his complaints of pain, and his explanation of the RFC determination was inadequate and flawed. On this record, I cannot find that substantial evidence supports the ALJ's RFC assessment or the Commissioner's final decision that Hilbert is not disabled. Accordingly, the Court will **GRANT** Hilbert's motion for summary judgment, ECF No. 15, **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g). A separate Order will enter.

ENTER: July 27, 2015

Joel C. Hoppe
United States Magistrate Judge

26